Dawson et al. *vs*. The Real Estate Bank.

swerable to the complainant for the damages he may have sustained. That damage seems to have been calculated and awarded upon a correct basis. The Chancellor, in rendering the decree, debited and credited each of the partners in conformity to the articles of agreement, with their respective advances and expenditures, taking a list of the notes and accounts furnished by the books, and properly auditing them; and he then charged Howell with fifty per cent. profit upon the whole amount of goods he purchased at Philadelphia, as well. as the stock on hand belonging to the firm. In this calculation and adjustment, we perceive no error. Decree affirmed.

---

## DAWSON ET AL. *vs*. THE REAL ESTATE BANK.

The stockholders of the Real Estate Bank have a common interest in its capital stock; and this stock is a fund, raised for the exclusive purpose of banking, by the sale of State Bonds.

This fund was to be applied to the legitimate purposes of banking according to the common usages of such institutions, with a constant view to the advancement of the great agricultural interests of the State, consistent with the terms of the charter, and the general laws of the land.

The corporation had power to acquire, hold, and dispose of property; to contract liabilities, and emit bills for circulation as a currency: to make loans, and receive deposits; subject to the limitations of her charter.

The profits were to be added to the capital, and be employed, until all her liabilities were discharged.

Her issues were based upon her cash capital, and no disposition of that capital could be made until all issues were redeemed.

To have disposed of her capital for a different purpose, would have been to deprive herself of all power of redeeming her issues; to depreciate her circulation, and defeat the object of her creation. The capital could not be disposed of by way of loan or discount.

Loans and discounts must be made upon her issues, and not upon her cash capital.

A note given by a stockholder for money borrowed, is a single transaction, and he is bound to repay the amount with interest; and a suit at law to compel such payment may well be maintained.

The obligation between such stockholder and the bank, is strictly legal, and properly cognizable in a law court.

The stockholder's right of loan consists in this; the bank must loan him a sum equal to half his interest in her capital, but when he applies for the loan, he is bound to give *good* and *sufficient security* for the payment thereof, and until he does this he has no right to the money.

This is a condition precedent with which he is bound to comply, before his right to enjoy the credit exists. He must pay the interest annually in advance, and the principal in equal instalments. As long as he does this, his right to the credit continues,

Dawson et al. *vs.* The Real Estate Bank.

but no longer—the whole then becomes due presently, and payment may be enforced by suit.

An allegation in pleading, that a bank held cash belonging to D. "*on deposit, and payable to his order,*" amounts in law to an allegation of a *general* deposit, creating the relation of debtor and creditor.

If a bank has in possession funds belonging to a principal debtor, which she has by law the right to appropriate in discharge of his debt to herself, and does not so appropriate it, his securities are released by this neglect, to the *extent of such* funds.

But she has no right to appropriate to the payment of a joint and several note executed to her by A. as principal, and B. and C. as securities, funds on deposit, belonging to A. alone : because there is no such mutuality of indebtedness as admits one claim to be set-off against the other; and because the statute expressly excludes the contracts from the law of set-off.

A mere omission to sue for any length of time is no release of a security.

When a bank receives funds as a special deposit, she is bound to keep them, and restore the identical funds on demand.

The rule as to a general deposit is different; she is in such case only to restore the like value, in kind, with interest.

When money, not in a sealed packet, bag, box or chest, is deposited with a bank, the law presumes it to be a general deposit until the contrary appears.

Otherwise, if it be in a sealed packet, bag, box or chest, and the like.

THIS was an action of debt, determined in the Pulaski Circuit Court, at March term, 1841, before the Hon. JOHN J. CLENDENIN, one of the circuit judges. The bank sued Dawson, Cummins and Tucker on a note executed by Dawson as principal, and the others as securities, for $8000. The defendants filed three pleas; the first, payment, to which issue was joined; to the other two, demurrers were sustained, whereupon they took leave to amend, and filed five new pleas. The first alleged, in substance, that Dawson was a stockholder to the amount of two hundred and fifty-four shares, of one hundred dollars each, and that the sum sued for was part of the credit allowable to D. as such stockholder, out of the funds of the bank, by virtue of the 17th section of the charter: that by resolution of the central board of said bank, it was agreed that D. should have the sum sued for, as part of his stock credit, upon his executing the note mentioned in the declaration: that by the 17th section of the charter, D. was entitled to a credit of $12,700, at the time of making the note sued on, and that the amount of that note was for no other consideration, than so much money received by D. as such stockholder on his stock credit, and being for so much stock credit as was payable only in equal annual instalments. The second, also alleged that D. was a stockholder, as in the first plea; and that the note sued on was executed by D. as principal, and the other defendants as securities, in consideration that the amount had been received by D. as

so much of his stock credit. The third, alleged that the bank before and at the time of the commencement of the suit, was indebted to D. in the sum of $12,700, for so much money due to D. on an account stated. The fourth, alleged that the bank, before and at the commencement of the suit, was indebted to D. in the sum of $12,700, on an account stated, being the same, in substance, as the third plea. The fifth, alleged that the supposed note mentioned in the declaration, was executed and delivered with the express understanding that it should remain in possession of the bank, as evidence that that amount had been received by D. as a stockholder; and it was further agreed that the amount mentioned in the note, though by the terms of the note payable in nine months, should be a stock credit or accommodation, payable as a credit allowable to stockholders under the charter of the bank, which was accepted with the express understanding that it should be paid in equal annual instalments, the interest to be paid annually in advance—and reference was made to the minutes of the central board, and charter of incorporation. Cummins and Tucker filed a separate plea, alleging that after said note became due, the bank, without the knowledge or consent of either of them, gave D. time, and indulged him in the payment thereof for a period of nine months, during which time the bank held cash belonging to D., on deposit, and payable to his order, amounting to $8,500: that after the note became due, the bank had many cash transactions with D., and loaned him large sums of money, by which D.'s securities were injured and their risks increased; and that during the delay and indulgence given to D., he had become insolvent, and unable to pay the note sued on, or his other liabilities. To the five pleas the plaintiff demurred, and moved to strike out the separate plea. This motion was overruled, and a demurrer filed; and a joinder entered to the whole. After argument the demurrer was sustained, and final judgment was entered for the plaintiff on the issue to the plea of payment, and on the demurrer. The case came here by writ of error.

*Gilchrist, Cummins* and *Blackburn,* for plaintiffs.

*Pike,* contra.

*By the Court,* RINGO C. J. The demurrers to the first, second and fifth amended pleas, in the view which we have taken of the subject, present but two questions: First, can the bank maintain an action at law on the notes or obligations of a stockholder, given on account of money obtained by him from the bank? *Second,* could the bank legally take from a stock holder such note or obligation as that sued on, as a security for money obtained therefrom by him on account of his credit therein as guarantied by the 17th section of her charter?

In controverting the first proposition, it is urged on the part of the plaintiffs in error, that the corporators have a joint or common interest in the subject matter in litigation; that it is parcel of the joint stock of the company, and one of the numerous unsettled transactions existing in respect of their joint business, over which a court of common law has no jurisdiction: that the pleadings show a transaction, of which no tribunal but a court of equity can take cognizance.

To determine this question correctly, the rights of the respective parties and the relation each bears to the other, in regard to the demand in question, must first be ascertained. The first section of the charter declares that a bank shall be established "under the name and title of 'The Real Estate Bank of the State of Arkansas,' with an original cash capital of two millions of dollars, to be raised by loans or negotiations on the security of real property, at its cash value, with the guarantee of the public credit as hereinafter provided:" The 4th section provides "that books of subscription for the sum of two millions two hundred and fifty thousand dollars, divided into shares of one hundred dollars each, and intended to secure the said loan of two millions of dollars," shall be opened and kept open as therein prescribed. The 5th section provides, amongst other things, for the appointment of managers, and their award of the capital stock of said bank, to such of the subscribers as should appear to them to be entitled thereto, under the provisions of the charter. The 7th, 8th and 9th sections provide for the election and appointment of directors,

and the organization of the different boards of directory. The 10th section pledges the "faith and credit of the State" for the security of the capital stock of the bank and interest, and provides for issuing bonds of the State for two millions of dollars, payable to the order of the bank and transferable by her. The 11th section binds the bank to pay said bonds and interest, as the same shall become due and payable. Section 13 requires all subscriptions to the capital stock to be guarantied and secured by mortgages and bonds executed to the bank, to be in all cases equal to the amount of stock subscribed; which bonds and mortgages are by the 11th section transferred to the State, and the holders of the bonds, which may be issued by the State in virtue of this act. Sections 15 and 16 prescribe what lands may be mortgaged by the subscribers to the capital stock. By the 21st section, the subscribers to the capital stock are "created a corporation and body politic for the term of twenty-five years from the passage of this act, and shall be and are hereby made capable, under the name of the 'Real Estate Bank of the State of Arkansas,' to receive, possess and hold all kinds of property, either movable or immovable, to sell, grant, bargain, alien or demise, and dispose of the same; to loan, negotiate, to take mortgages and pledges, and to discount on such terms and such securities as they shall think proper; provided, the whole amount of their discounts and loans do not exceed double the amount of the effective capital of said bank; and provided also, that the debts due by said principal bank or any of its branches, exclusive of deposits, shall not exceed double the amount of their said capital." Section 37 declares "that the whole of the profits arising from the employment and use of said capital stock of two millions of dollars, as the same accumulates, shall become capital, remain with and be employed by said bank and branches, until the full and final payment of the bonds of the State, and all the responsibilities of said Real Estate Bank are fully and finally paid off and discharged, when a dividend shall be made to the stock holders of all the remaining funds, to each in proportion to his share of stock, to be paid in such instalments as the funds of, and debts due to the bank, will justify being made from time to time, after the twenty-second year of this char-

ter." Section 38, declares "that the said corporation shall nevel suspend or refuse the payment, in current money of the United States. of any of its notes or obligations, or of any funds received by them on deposit." Section 40, provides "that the bills or notes obligatory, which it shall be lawful for the said corporation to issue, shall not be for a less denomination than five dollars, and if payable to order, trans ferable by endorsement; and if payable to bearer, they shall be trans ferable by delivery;" and the 17th section declares "that each and every stockholder shall be entitled to a credit equal to one half of the total amount of his shares; provided, that as he may use said credit, notes or obligations for the amount so used shall be furnished, and the interest thereon shall be annually paid in advance, and the principal shall be paid in equal instalments, so that the whole shall be paid in twenty years from the passage of this act."

These quotations from the charter embrace, we think, every provision contained in it, which can possibly have any influence upon the question under discussion. From them, we consider it perfectly manifest that the stockholders have a joint, or, more properly speaking, common interest in the capital stock of the bank. It is a fund raised upon the negotiation or sale of certain bonds of the State, for the security and payment of which, with interest, each original stockholder was required by law to become bound by bond and mortgage of real estate equal in amount, at least, to his proportion of stock as awarded to him by the managers. The object for which this common fund was to be raised, and for which it was to be exclusively used, was banking. The principal, perhaps the only object for which the bank was established, was to aid the great agricultural interests of the State. This common fund, constituting the capital stock of the bank, was to be, and so far as it has been raised, was raised upon securities, the legal interest in which was vested in the bank: they were negotiated and disposed of by her authority; she received the funds thus raised, and held them legally in her custody, to be used and applied by her exclusively to the legitimate objects of banking, according to the common usages and practice of similar institutions, with a constant view to the advancement of the agricultural interests

Dawson et al. *vs.* The Real Estate Bank.

of the State; and in a manner consistent with the rules prescribed by her charter, and the general laws of the land. She was invested not only with the power of acquiring, holding and disposing of property, and of contracting obligations and liabilities generally, but also with the more important power of issuing and emitting her notes or bills for circulation, as a currency; of making loans and discounts, and receiving deposits, subject only to three limitations, prescribed by the charter: that is, that she should not emit any note or bill of a less denomination than five dollars; that her loans and discounts should never exceed double the amount of her effective capital, and that her debts at any time due, exclusive of those on account of deposits, should not exceed twice the amount of her capital. But the profits arising from the use of the capital, as they should accumulate, were to be added to, and form a part of, the capital stock of the bank; and were to remain with, and be employed by, the bank, until the full and final payment of the bonds of the State, and all of the responsibilities of the bank should be fully and finally paid off and discharged: whereupon, after the twenty-second year of the charter, but not sooner, it was contemplated that a dividend should be made to the stockholders of all the remaining funds, according to the provisions of the 37th section above quoted.

Now, if we have not mistaken the object for which this corporation was created; and if that object was, as we have supposed it must have been, to aid the great agricultural interests of the State, was it not designed to effect this object by means of the emission and circulation of the notes or bills of the bank, and thus afford to those engaged, and to such as might wish to engage in agricultural pursuits, greater facilities in obtaining the money, or means necessary to the accomplishment of their designs? That such was the object and means of effecting it, contemplated by those who granted the charter of the bank, we have no doubt. And inasmuch as the paper issues of the bank are based upon its effective capital, or to speak more properly, upon its cash capital actually in the vaults of the bank, or otherwise subject to its direct and immediate control, and no other security being provided for their payment, it follows necessarily that this fund ought to have been, and was intended to be, kept and held by the

bank for this special purpose; and except such portion thereof as must have been necessarily used in putting the bank in operation, no other disposition of it could be legally made, until all the notes or bills, issued and put in circulation by the bank, were redeemed; and even then we deem it questionable, at least, whether it could be lawfully appropriated to any object other than that for which it was created during the existence of the corporation: but as this is not a question in the present inquiry, we leave it to be determined when its adjudication may become necessary.

If, however, the bank possessess the power of issuing and circulating her notes or bills as currency, to any amount not exceeding double the amount of her effective capital, and her charter provides no means other than her capital stock for their payment on demand, and forbids her ever suspending or refusing payment thereof in current money of the United States, is it reasonable to suppose that she possesses legally the power of disposing of that fund in a different way, and for a wholly different purpose? We think it is not; because its exercise would at once deprive the note holders of their primary and principal, if not their only security, for immediate payment, and herself of the ability to perform the obligation imposed on her by the charter, and thus exhibit to the world the anomaly of a corporation possessing the power of defeating the object for which it was created, by acts clearly unauthorized, if not enjoined by its charter, and of a bank legitimately issuing and circulating as currency, her notes and bills based upon a cash capital, and at the same time by parting with a moiety if not the whole amount of her said capital, divesting herself of all means and power of redeeming them according to her promise. Besides, if such authority was conferrd upon and exercised by the bank, one of the almost inevitable consequences would be to impose on the community the paper issues of the bank, which she could neither pay on demand, nor within any reasonable time if ever. Under such circumstances, her paper would inevitably depreciate in value, and so long as it continued to circulate as currency, the holders thereof, generally, would unquestionably suffer, and thereby lose an amount equal to the amount of such depreciation; and thus, the bank, instead of accomplishing the object for which it was created, could, without violat-

ing the provisions of her charter, with great ease so manage her operations as to give to those, whom it would be her interest or pleasure to favor, all the advantages to be derived from the use of her capital, while those less favored would be compelled to receive her paper, or go without any loan or discount. But we are clearly of the opinion that no such authority is to be found in the charter, and that its exercise would be not only impolitic, but repugnant to every principle of justice, and consequently as she could not dispose of her capital by way of loan or discount, but was bound to base her issues and emissions of notes or bills upon it, and make them the subject of her loans or discounts, unless she had other funds besides her capital, there certainly is not, between a stockholder obtaining such discount and the bank, any such relation as in law precludes the bank from maintaining an action at law against him, upon the note or obligation taken as a security for such discount. The transaction in this view of the subject, has no such connection with the common fund as to make it on that ground cognizable in a court of equity. It is a single transaction, in which the bank, in her corporate capacity, as the legal proprietor and owner of both the capital stock or common funds of the stockholders, and her paper issues based thereupon, makes a loan or discount of a certain amount of the latter to an individual, who, notwithstanding he is a stockholder, and entitled, upon the dissolution of the corporation, and the payment of all her liabilities, to an account and dividend of the residue of the common fund, is legally bound to account for, and pay to the bank, previously thereto, the sum thus borrowed and received with interest. This, according to our understanding of the charter, is the only relation that can possibly exist between the parties, from the facts, as shown by the pleadings in respect to the first proposition above stated. The bank was unquestionably the legal owner of the funds received by Dawson, and so she is of the note executed by him and his co-plaintiffs in error, in consideration thereof. The obligation existing between them and the bank is, in every point of view, purely and strictly a legal obligation. It is not a contract between the corporators, nor does it touch or affect any thing to or in which they have or can have any legal interest, until the corporation is dissolved, its debts extinguished and its remaining funds

divided and distributed between them. Previous to such distribution being made, their interest in the capital funds and the assets of the bank, is purely equitable. The bank, it is true, is in some respects their agent, but it is an agent invested with the legal interest in the whole subject matter confided to its management. Its power to contract with the corporators is unquestionable, and as no equitable rights appear to be involved in the contract here sued on, the action, according to the general rule that the party, in whom the legal interest is vested, must sue, is properly brought, and may well be maintained in a court of law.

We think proper to remark here that this case is not within the principles held in any of the cases cited in the brief to this point. To uphold their jurisdiction in suits at law brought by the bank of the United States, the courts of the United States held that in suits prosecuted in the corporate name of the Bank of the United States, the company using that name are the real parties to the controversy, and they may be so considered in a court of law, that they can therefore look beyond the corporate name for the purpose of ascertaining their citizenship or alienage, and thereby discovering whether they are such persons as, according to the constitution and laws of the United States, are entitled to sue thereon. But this principle is admitted for the purpose of vindicating and maintaining the jurisdiction expressly conferred upon them by law; and we are not aware of its having at any time been applied for a different purpose, or to a case where jurisdiction would not be unjustly and illegally asserted or refused by them, if the nominal parties to the controversy only should be regarded, and no notice taken of those really concerned and interested in the controversy. This principle, as applied by the Federal Courts, is unquestionably right, but its application to the case under consideration, is not perceived. The inquiry here, is not, whether the parties to the controversy, are such as may sue in the circuit courts, but whether the matter in controversy, as between the parties, is cognizable in a court of law; and therefore, admitting the principle asserted in the cases cited to this point, and considering, as we have, the relations existing between the parties, as well as those between the demand in controversy, and the common funds of the company vested in the

corporation; still, unless we have wholly misconceived the rules prescribed to the corporation by the charter, in regard to the disposition to be made by it of the common funds of the company, or capital of the bank, and the rights of individual members of the company or corporators, in respect thereto, the demand in suit can have no such connection with the common funds or capital of the bank, or the general accounts relating thereto, as excludes it from the cognizance of a court of law, or invested a court of equity with jurisdiction over it. It is, in every view of the subject, a single insulated transaction, consisting entirely of a legal right on the one hand, and a legal obligation or duty on the other in the complete and final adjustment and enforcement of which no equitable rights or complicated accounts, claims or demands whatever, appear to be in any manner involved; consequently there does not appear in the case any ground for the exercise of equity jurisdiction over it. But, on the contrary, it appears clearly to be a matter within the cognizance of a court of common law.

Against the second proposition it is urged, that a stockholder was unconditionally entitled to receive from the bank and to use an amount of money equal to one half the amount of his stock or share in the capital of the bank; and that he could only be bound in any event to pay the same by annual instalments, so that the whole should be paid in twenty years from the date of the charter: that the notes and obligations given to the bank for the money received by virtue of the credit given to the stockholders in said bank by the 17th section of her charter, could only operate as a receipt for so much of his stock credit: that it was agreed that the note sued on should have no other force or legal effect, and that the promise to pay at nine months is contrary to the agreement and understanding of the parties, in violation of the provisions of the charter, and therefore void.

These conclusions are drawn from a construction put by the counsel for the plaintiffs in error, upon the 17th section of the charter of the bank, and their truth or error undoubtedly depends to a certain extent upon its provisions; but in order to understand and interpret them truly, they must be considered in connection with other provisions of the charter, and not as standing alone or disconnected from them.

While considering the first proposition, we have endeavored to

ascertain the object for which the corporation was created, the means which were prescribed for its use, with a view to the accomplishment of that object, and some of the restrictions of its powers imposed by the charter, in regard to the disposition and use to be made of the common funds of the company, or capital stock of the bank, and have stated the result of our deliberate judgment in respect thereto.    And if our conclusions are correct that the bank could not part with any portion of her capital, by way of loans or discounts, either to stock-holders or others; and if she made loans or discounts they must be made of her own notes or bills, and such other funds as she might own, exclu-sive of her capital; we cannot conceive how it is possible that the note or obligation of a stockholder, furnished the bank for the funds obtained by him from her on account of the credit guarantied to him by the 17th section of the charter, should only operate as a receipt: such indeed might be its only effect, if it were true, as the plaintiffs seem to suppose, that he was only receiving from the bank something pre-viously and at the time his own; but such, in our opinion, is not the case: for he never had a legal title to any portion of the capital stock, or of the bank notes based upon it, before they were put into circu-lation, and he is bound in any event to pay to the bank the amount so obtained from her, before any devidend of her capital stock can be made according to the provisions of the charter.

The right secured to a stockholder by the 17 section of the charter, we understand to be simply this, that he shall have a credit in the bank equal to one half the amount of his stock: that is, that the bank shall loan or discount to him a sum equal to half the amount of his shares in her capital; but upon his application to use or avail himself of such credit, he is bound to give the bank such notes or obligations for the sum applied for on account of such credit, as will, in the opinion of the bank directory, to which such application is made, constitute a *good* and *sufficient security* for the payment thereof, according to the terms stipulated in the contract between them for such loan or discount; and until he shall do this, he has under this section no right to the money; or, in the language there adopted, to " use said credit," and the bank, in such case, would be bound to withhold it, by refusing him the loan or discount demanded .    This, according to the plain

import of the term used and the obvious design of the law, constitutes a condition precedent, which he is bound to perform, before his right to use or enjoy the credit exists.   The language of the statute is plain and explicit, and the reason for requiring security in such case is equally obvious.   It is also urged that the bank, in such case, can only take notes or obligations containing stipulations for the payment of the sum obtained on account of such credit, in such annual instalments, that the whole shall be paid in twenty years from the date of the charter, and that she cannot in any event, take such note or obligation payable at any period of time less than one year.   Here again, in regard to this point, we consider the language of the statute so plain, and the intention of the legislature so obvious, as to admit of no serious doubt.   The interest must be paid annually, in advance, and the principal in equal instalments, so that the whole shall be paid in twenty years from the date of the charter; but suppose they are not so paid, shall the credit, in that event, continue until the expiration of the twenty years?   Such, we apprehend, is most clearly not the design of the law.   It makes these annual payments the condition upon which the credit may be enjoyed for the period of twenty years from the date of the charter; and they, too, constitute a condition precedent upon which his right to the continued use and enjoyment of his credit depends, and therefore he can only claim the right when and for so long a time as he shall perform the conditions upon which the law grants it to him, or makes it depend.   As to the objection that the note is void, because it is made payable at nine months from its date, we consider it only necessary to say that we are not aware of any provision of law in anywise restricting, in this particular, in such case as the present, the general power of the bank to take notes or obligations at any time, not exceeding one year from their date; and, subject to this limitation, the term of credit, we think, depends entirely upon the contract; and although there are, probably, many cases, where the term of credit may be greater than one year, it could not be legally claimed, or with propriety given for a longer period upon a loan or discount made under the provisions of the 17th section of the charter; because in such case, upon the failure at any time to pay the interest in advance and a certain instalment annually, the stockholder's

right to any credit, or further time for the payment of the sum so obtained from the bank, entirely ceases, and from the time when such failure occurs, has no legal existence: consequently payment of the whole amount due on such account, may at any time thereafter be demanded and coerced by suit.

If the view which we have taken of the law, and of the rights of the parties respectively, be correct, there can be no question that the first, second, and fifth amended pleas are insufficient in law to bar the action, and therefore the demurrer thereto was well taken.

The third and fourth amended pleas are within the rule established by this court in the case of *Trammell v. Harrell*, 4 *Ark. Rep.* 602, and failing to show such mutuality of indebtedness between the parties as, according to that rule, entitles Dawson separately, or the plaintiffs in error jointly, to set off the demand alleged to be due and owing by the bank to Dawson, against the debt due from them to the bank, was properly adjudged insufficient on the demurrer thereto.

The validity of the sixth plea, filed by Tucker and Cummins, depends, first, upon the fact of their being only sureties to the bank for Dawson; and secondly, upon the right and obligation of the bank to appropriate the funds of Dawson, the alleged principal debtor, held by her on deposit and payable to his order, in payment or extinguishment of the note held by her against the plaintiff in error.

The second proposition will be first considered.

In order to ascertain what power the bank had over the funds of Dawson, and the duty enjoined upon her by law, it is necessary first to determine whether they were held as a special or general deposit. If the funds were held as a special or general deposit, the authorities all agree that the bank had no right to use or dispose of them; but was bound simply to keep them, and restore to the depositor the identical funds deposited. If they were held either as a general or irregular deposit, the rule appears to be equally well established that, upon such deposit being made, the legal interest in the money or thing deposited, became immediately vested in the bank, and the relation of debtor and creditor was thereby created between the parties; that is, as between the bank and Dawson, the latter became the creditor and the former his debtor, to the amount or value of the deposit. And in such

case, the bank having acquired the absolute property in the thing deposited, could lawfully dispose of them in any manner she pleased, her obligation being only to restore to the depositor the like sum or value in kind with interest, but not the identical thing deposited. *Commercial Bank of Albany vs. Hughes,* 17 *Wend.* 94. *Foster et al. Ex's vs. The Essex Bank,* 17 *Mass. R.* 477. *Story Com. on Bailment,* 60. *Ib.* 66.

From a careful consideration of the authorities on this subject, we understand the general rule to be, that where money, not in a sealed packet, or closed box, bag or chest, is deposited with a bank or banking corporation, the law presumes it to be a general deposit, until the contrary appears; because such deposit is esteemed the most advantageous to the depositary, and most consistent with the general objects, usages, and course of business of such companies or corporations. But if the deposit be made of any thing sealed or locked up, or otherwise covered or secured in a package, cask, box, bag or chest, or any thing of the like kind of or belonging to the depositor, the law regards it as a pure or special deposit, and the depositary as having the custody thereof only for safe keeping, and the accommodation of the depositor.

The language used in the plea certainly does not indicate, with any degree of clearness or legal accuracy, what was the true character of Dawson's deposit with the bank; but leaves it to be determined by legal presumptions and inferences, whether it was a special or general deposit, or, to speak more appropriately, whether it was what the law considers a pure and simple deposit, an *irregular* deposit, or *a mutuum.* The allegation is, that the bank held in her possession cash belonging to Dawson, and payable to his order, and on deposit, &c., and this, when tested by the principles above stated, raises the legal presumption that it was not a pure or special deposit, but must have been either an irregular deposit, or a mutuum, or a loan; and it is of no importance in the present inquiry, to determine to which class of these it properly belongs, because in either case, the same relation of debtor and creditor must subsist between Dawson and the bank, and the right of the latter to use and appropriate the deposit would be complete. This plea, therefore, in our opinion, simply alleges that

38

the bank was indebted to Dawson individually in the sum of $8,500, for so much money by him deposited with her to his own credit, and that she continued so indebted to him, after the note here in suit was due. And if the bank possessed the power of appropriating the money due and owing by her to Dawson, in satisfaction and discharge, or extinguishment of the debt due and owing to her by Dawson, Cummins and Tucker, she was, from the facts shown in this plea, bound by law so to have appropriated it, or discharge Cummins and Tucker from all liability on the note, to the amount of the deposit, if they were in fact only liable thereupon as securities for Dawson. Because, in such case the law regards the omission of the creditor to apply the funds or means of the principal debtor, in extinguishment of the debt due from himself and securities, as a fraud upon the securities, and therefore discharges their liability on such contract. This we understand to be the true principle; and it is believed to be the principle upon which the court proceeded in the cases cited to this point by the counsel.

But the question still remains to be decided, whether the facts so pleaded show a case, in which the bank possessed the power of appropriating the money or means of Dawson to satisfy the debt or note in question. The bank, it is true, was indebted to Dawson; but could she retain the amount of her indebtedness to him, and apply it as a payment on account of this note? We think she could not, and that if she had so applied it, without his assent, he could, notwithstanding, have coerced her by law to pay it to him; and we are not aware of any principle upon which she could, either at law or in equity, have resisted the enforcement of her liability on account of his deposit, by placing the same amount of her own money to the joint credit of himself and his securities; and yet this would be all that she could do without his assent; for their respective rights existed in action only, and neither party possessed any money or other specific thing belonging to the other, and so, of course, neither party could extinguish his or her legal liability to the other by the payment of an equal amount to a third party, without showing that it was made by request of the creditor party, or at least with his or her assent. No such request is shown by the plea, and the law does not presume its existence. Conse-

Dawson et al. *vs.* The Real Estate Bank.

quently, the bank does not appear to have had any legal authority to appropriate the money, due from her to Dawson, to the payment of the debt due from him, Cummins and Tucker, to her. Nor could she set off the debt due to her from Dawson, Cummins and Tucker against that due from her to Dawson in any suit prosecuted by him against her for the recovery thereof, because there is not such mutuality of indebtedness between the parties as the law requires to exist, where the demand of either party may be set off in an action at law, instituted for the recovery thereof by the other, according to the rule prescribed by this court, in the case of *Trammell vs. Harrell*, 4 *Ark. Rep.* 602; but even if there existed the requisite mutuality of indebtedness between the parties, the set-off could not be allowed, because the contracts are of the description mentioned in the 2d section of an act of the legislature, approved 16th December, 1838, from which the law of set-off is, by the provisions contained in said section, expressly excluded.

Having thus disposed of the second question presented by the plea, we deem it wholly unnecessary to discuss or decide the first; because, the answer to it, whether in the negative or affirmative, could have no influence whatever in the case.

The principles relative to the indulgence alleged by this plea, to have been given by the bank to Dawson, after the maturity of the note sued on, are too plain and familiar to require any discussion or citation of authority. The bank merely omitted to sue for about the period of nine months after her right of action accrued. This is the whole substance of the argument; and it certainly does not in law constitute a defence to the action. This plea, therefore, in our opinion, interposes no bar to the action, even as to Cummins and Tucker, by whom it is separately pleaded; consequently, notwithstanding the record shows great irregularity in the proceedings in the court below as to this plea, which is not embraced by the demurrer to the other amended pleas, and which, although not demurred to at all, appears to have been adjudicated by the court as upon demurrer; yet as the final judgment upon the whole record appears to be right, this court would not be justified in reversing it for such irregularity, nor for the purpose of enabling the defendants to amend their pleading so as to

make it present a good bar to the action. This they were bound to have done in the first instance; and not having done so, must now abide the consequences of their failure.

The question presented by the record and assignment of errors as to the interest adjudged to the bank, is within the principles established by this court, in the case of *McFarland vs. The Bank of the State of Arkansas*, 4 *Ark. Rep.* 410, and other cases since determined, in which similar judgments have been determined.

Judgment affirmed.